Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BEXIL ADVISERS LLC, | Case No: |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| MVC CAPITAL, INC., JOHN CHAPMAN, PHILLIP GOLDSTEIN, GERALD HELLERMAN, DOUGLAS KASS, ROBERT KNAPP, SCOTT KRASE, ART LIPSON, and MICHAEL TOKARZ, | |
| Defendants. | |

Plaintiff Bexil Advisers LLC ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

## NATURE OF THE ACTION

1. This is an action against MVC Capital, Inc. ("MVC" or the "Company"), and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a)

and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed acquisition (the "Proposed Transaction") of MVC by Barings BDC, Inc., its direct wholly-owned subsidiary, Mustang Acquisition Sub, Inc., and Barings LLC, the external investment adviser to Barings BDC, Inc. (collectively, "Barings").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and the Company conducts business in New York.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff is, and has been at all relevant times hereto, an owner of MVC's common stock.

7.      Defendant MVC is a business development company specializing in equity, acquisition financing, mezzanine financing, management buyouts, leveraged buildups, corporate

2

partnerships, PIPE transactions, going private transactions, private company recapitalizations, operational turnarounds, and growth and expansion capital transaction financing. The Company is incorporated in Delaware and its principal executive office is located in Purchase, New York. The Company's common stock trades on the New York Stock Exchange under the ticker symbol, "MVC."

8.     Defendant John Chapman ("Chapman") is a director of the Company.

9.     Defendant Phillip Goldstein ("Goldstein") is a director of the Company.

10.    Defendant Gerald Hellerman ("Hellerman") is a director of the Company.

11.    Defendant Douglas Kass ("Kass") is a director of the Company.

12.    Defendant Robert Knapp ("Knapp") is a director of the Company.

13.    Defendant Scott Krase ("Krase") is a director of the Company.

14.    Defendant Art Lipson ("Lipson") is a director of the Company.

15.    Defendant Michael Tokarz ("Tokarz") is Chairman of the Board of the Company.

16.    Defendants Chapman, Goldstein, Hellerman, Kass, Knapp, Krase, Lipson, and Tokarz are collectively referred to herein as the "Individual Defendants."

17.    Defendants MVC and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.  Background of the Company and the Proposed Transaction

18.    MVC is a business development company that provides long-term debt and equity investment capital to fund growth, acquisitions and recapitalizations of companies in a variety of industries.

19.    On August 10, 2020, MVC and Barings announced that they had entered into a

definitive merger agreement under which MVC would merge with and into Barings BDC, Inc.

Under the terms of the agreement, MVC shareholders would receive 0.94024 Barings BDC, Inc.

shares for each MVC share. The press release states, in pertinent part:

**MVC Capital, Inc. To Merge With Barings BDC, Inc.**
Combined Company To Be Managed by Barings LLC

NEWS PROVIDED BY
Barings
Aug 10, 2020, 18:38 ET

CHARLOTTE, N.C. and PURCHASE, N.Y., Aug. 10, 2020 /PRNewswire/ - - Barings BDC, Inc. (NYSE: BBDC) ("Barings BDC") and MVC Capital, Inc. (NYSE: MVC) ("MVC Capital") announced today that they have entered into a definitive merger agreement under which MVC Capital will merge with and into Barings BDC (the "Transaction"). The combined company, which will remain externally managed by Barings LLC, is expected to have more than $1.2 billion of investments on a pro forma basis. The boards of directors of both companies, the MVC Capital Strategic Review Committee, the independent directors of MVC Capital and the independent directors of Barings BDC have unanimously approved the Transaction, which is expected to close in the fourth quarter of 2020.

Under the terms of the merger agreement, MVC Capital stockholders will receive aggregate consideration of approximately $177.5 million in the form of cash and stock consideration based on Barings BDC's June 30, 2020 net asset value ("NAV") representing total book value consideration of $10.01 per fully diluted MVC Capital share. On a market value basis, based on the closing price of Barings BDC common stock on August 10, 2020, the Transaction represents total consideration for MVC Capital stockholders of $145.5 million or approximately $8.21 per share, representing a premium of 21% to MVC Capital's closing price on August 10, 2020.

MVC Capital stockholders will receive 0.94024 Barings BDC shares for each MVC Capital share, resulting in approximately 16.7 million newly issued Barings BDC shares, having total value of $170.5 million, or $9.62 per share, based on Barings BDC's June 30, 2020 NAV of $10.23 per share. In addition, Barings LLC will pay approximately $7 million in cash, or $0.39492 per share, directly to MVC Capital stockholders at closing. Following the Transaction, Barings BDC's equity base is expected to expand by $170 million and Barings BDC stockholders and MVC Capital stockholders are expected to own approximately 74.2% and 25.8%, respectively, of the combined company. The total value of the consideration to be received by MVC Capital stockholders at closing is subject to adjustment as set forth in the merger agreement and may be different than the estimated total consideration described herein depending on a number of factors, including the number of outstanding shares of Barings BDC and MVC Capital common stock,

4

the payment of tax dividends by MVC Capital, undistributed investment company taxable income and undistributed net capital gains of MVC Capital and changes of the Euro-to-U.S. dollar exchange rate relating to certain of MVC Capital's investments between April 30, 2020 and the closing date.

In addition, Barings LLC will enter into a credit support agreement ("CSA") with Barings BDC, for the benefit of the combined company, to protect against net cumulative unrealized and realized losses of up to $23.0 million on the acquired MVC investment portfolio over the next 10 years.

Barings BDC will also provide up to $15.0 million in secondary-market support via accretive share repurchases over a 12-month period in the event the combined company's shares trade below a specific level of NAV per share following the completion of the first quarterly period ended after the consummation of the Transaction, subject to covenant and regulatory constraints (including Rule 10b-18 under the Securities Exchange Act of 1934).

Barings BDC has agreed that, on the closing date, it will increase the size of its board of directors and cause one current member of the board of directors of MVC Capital, to be mutually selected by MVC Capital and Barings BDC to be appointed to the Barings BDC board of directors.

In connection with the closing of the proposed Transaction, MVC Capital will repay all outstanding amounts under its existing credit facilities and any remaining obligations thereunder will be terminated. In addition, in connection with the closing of the proposed Transaction, Barings BDC intends to redeem MVC Capital's 6.25% senior notes due November 30, 2022 (NYSE: MVCD) with an aggregate principal amount outstanding of $95.0 million.

*     *     *

Consummation of the Transaction is subject to Barings BDC and MVC Capital stockholder approval, customary regulatory approvals and other closing conditions. J.P. Morgan served as sole financial advisor and Dechert LLP served as legal counsel to Barings BDC. JMP Securities served as financial advisor and Kramer Levin Naftalis & Frankel LLP served as legal counsel to MVC Capital.

20.     On November 24, 2020, Defendants caused to be filed with the SEC a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") under the Exchange Act in connection with the Proposed Transaction.

**B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions**

21.     The Proxy Statement, which recommends that MVC shareholders vote in favor of

the Proposed Transaction, omits and/or misrepresents material information concerning: (i) the combined company's financial projections; (ii) the financial analyses performed by the Company's financial advisor, JMP Securities LLC ("JMP"), in connection with its fairness opinion; (iii) potential conflicts of interest involving Credit Suisse and Wells Fargo; and (iv) the sales process leading up to the Proposed Transaction.

22.     The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Reasons for the Merger; (ii) Opinion of the Financial Advisor to MVC; and (iii) Financial Forecasts and Estimates.

23.     Unless and until the material misstatements and omissions (referenced below) are remedied before the December 23, 2020 shareholder vote on the Proposed Transaction, MVC shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

### 1.  Material Omissions Concerning the Combined Company's Financial Projections

24.     The Proxy Statement omits material information concerning the combined company's financial projections.

25.     The Proxy Statement discloses financial projections for MVC and Barings BDC for certain fiscal quarters/years in 2020 through 2022 but fails to disclose the financial projections for the pro forma combined company for the years 2020 through 2022. Without this information, shareholders cannot assess and evaluate the value of the combined company in the event the Proposed Transaction is consummated.

26.     The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the combined

company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisor, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to vote for or against the Proposed Transaction.

27.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 2. Material Omissions Concerning JMP's Analyses

28.     In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by JMP.

29.     With respect to JMP's "*Selected Public Companies Analysis,*" "*Selected Precedent M&A Transactions Analysis*," and "*Selected Public Companies Comparable Data*," the Proxy Statement fails to disclose the individual multiples and financial metrics of the companies and transactions observed by JMP in its analyses.

30.     The Proxy Statement fails to disclose the following concerning JMP's "*Dividend Discount Analysis*" of MVC and Barings: (1) the individual inputs and assumptions underlying the (i) discount rates ranging from 14.5% to 16.5% and from 14.0% to 16.0%, and (ii) range of terminal multiples of 0.75x to 0.95x and of 0.80x to 1.00x; and (2) the terminal values of MVC and Barings.

31.     With respect to JMP's "*Management Liquidation Analysis*," the Proxy Statement fails to disclose the individual inputs and assumptions underlying the range of NAV multiples of 0.60x to 0.74x.

32.     With respect to JMP's "*Premiums Paid Analysis*," the Proxy Statement fails to

disclose each transaction and the individual premiums paid therein.

33.     The Proxy Statement provides that, for purposes of its opinion, JMP "reviewed certain publicly available research analyst price targets for Barings BDC," but fails to disclose the individual price targets reviewed by JMP and the sources thereof.

34.     The valuation methods, underlying assumptions, and key inputs used by JMP in rendering its purported fairness opinion must be fairly disclosed to MVC shareholders. The description of JMP's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, MVC shareholders are unable to fully understand JMP's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 3.     Material Omissions Concerning Potential Conflicts of Interest Involving JMP

35.     The Proxy Statement omits material information concerning potential conflicts of interest involving JMP.

36.     The Proxy Statement provides that "JMP and its affiliates in the past provided investment banking and other financial services to MVC and received and may receive compensation for the rendering of these services, including, among other things, acting as agent for share repurchases by MVC."

37.     The Proxy Statement, however, fails to disclose the full nature and timing of the past services provided by JMP and its affiliates to MVC, Barings, and/or its affiliates, and the amount of compensation received or expected to be received by JMP and its affiliates for providing such services.

38.     The Proxy Statement provides that "MVC has agreed to pay JMP for its financial

advisory services in connection with the Merger an aggregate fee of $750,000, portions of which became payable upon JMP's engagement and upon delivery of JMP's opinion and a portion of which will become payable only if the proposed Merger is consummated."

39.     The Proxy Statement, however, fails to disclose the amount of JMP's fee that was paid upfront and the amount that is contingent upon the consummation of the Proposed Transaction.

40.     Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

41.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

42.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43.     During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

44.     Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose

such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

45.     The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

46.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

47.     Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

48.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

49.     The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

50.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

51.     In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

52.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

53.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

54.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9

promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D.      Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 13, 2020                        Respectfully submitted,

                                                **HALPER SADEH LLP**

                                                By: /s/ Daniel Sadeh
                                                Daniel Sadeh, Esq.
                                                Zachary Halper, Esq. (to be admitted *pro hac vice*)

667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
        zhalper@halpersadeh.com

*Counsel for Plaintiff*